UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HOLLY O'BYRNE,**<br>**Plaintiff,**<br>**v.**<br>**DISTRICT OF COLUMBIA**<br>**and**<br>**DISTRICT OF COLUMBIA FIRE FIGHTERS ASSOCIATION, LOCAL 36, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO,**<br>**Defendants.** | **Civil Action No. 25-4482 (JDB)** |

## MEMORANDUM OPINION

Plaintiff Holly O'Byrne, an employee at the D.C. Fire and Emergency Medical Services Department (FEMS or the Department), sued the District of Columbia and the D.C. Fire Fighters Association, Local 36 (Local 36) alleging that the Department's promotion policies constitute unlawful gender discrimination and violate the disparate impact and disparate treatment provisions of Title VII and the District of Columbia Human Rights Act. Both defendants moved to dismiss the complaint for failure to state a claim. For the reasons explained herein, the Court will deny defendants' motions to dismiss as to both the disparate impact and disparate treatment claims.

## Background

The following facts are drawn from O'Byrne's complaint and accepted as true for the purposes of this motion to dismiss. FEMS provides fire and emergency medical services to the District of Columbia. Am. Compl. [ECF No. 15] ¶ 10. O'Byrne has worked for FEMS since August 2013. Id. ¶ 20. She was hired as a paramedic and promoted in 2017 to Field Training

Officer, in 2020 to EMS Sergeant, and in 2022 to EMS Lieutenant. Id. She has received positive performance evaluations and related awards. Id. ¶¶ 21–22.

The Department employs around 1,900 people, 13% of whom are women. Id. ¶ 23. Relevant here, there are two categories of FEMS employees: (1) dual-role firefighters who also perform EMS functions (firefighters or Fire candidates), and (2) single-role paramedics who perform EMS, but not firefighting, functions (paramedics or EMS candidates). Id. ¶¶ 24–25. Only about 10% of firefighters are women, compared to about 57% of paramedics. Id.

## I. The Promotional Process

Local 36 is a labor union that represents firefighters employed by FEMS. Id. ¶¶ 12, 28. In 2020, Local 36 and FEMS negotiated and signed a memorandum of agreement (MOA) setting out the current promotional process for all employees within the Department.[1] Id. ¶ 28. Both before and after the 2020 MOA was implemented, firefighters are promoted through the ranks from firefighter to Sergeant to Lieutenant to Fire Captain. Id. ¶ 35. Before the 2020 MOA was implemented, EMS employees could be promoted from the role of paramedic directly to the role of EMS Battalion Supervisor or EMS Captain, "which was equivalent in pay and grade to the Fire Captain rank." Id. ¶ 36. But since the MOA's implementation, paramedics must now achieve promotions to the roles of EMS Sergeant and then Lieutenant, respectively, before becoming eligible for a promotion to EMS Captain. Id. ¶ 37.

The promotion process implemented in 2020 applies at each step of promotion, and involves a written exam, an assessment, and a relative ranking system. Id. ¶¶ 33, 39–52. The

[1] O'Byrne presumes, based on the text of the MOA, that between 2020 and 2022, Local 36 and FEMS met to determine whether the promotional process required any modifications. Id. ¶¶ 30–31; see MOA [ECF No. 19-3] ¶ 8 ("The parties shall meet … after the publication of the final promotional list from the April 2020 examination but before the Department announces the April 2022 examination to determine if the agreed upon process requires modification."). The complaint alleges that both the MOA itself, and subsequent discussions between FEMS and Local 36, contributed to the reconfiguring of the promotion system. Id. ¶ 32.

written exam is identical for EMS and Fire candidates; however, it is scored differently for the two groups. Id. ¶¶ 39, 42. Specifically, the exam includes firefighting-specific questions that are scored for Fire candidates, but not EMS candidates. Id. EMS candidates are not told in advance which questions pertain to firefighting and will be unscored, and therefore must "expend test-taking time and mental energy answering questions that fall well outside the scope of their expertise." Id. ¶ 44. And because several questions are unscored for EMS candidates, every relevant question an EMS candidate gets wrong holds a penalty of 1.205 points, as compared to 1 point for Fire candidates. Id. ¶ 42.

If a candidate passes the written exam, they then take an assessment,[2] which differs for Fire and EMS candidates. Id. ¶ 45. There are study materials available for the Fire assessment but not for the EMS assessment. Id. ¶ 48. There are also fewer questions on the EMS assessment than the Fire assessment, so each wrong answer carries a greater penalty for EMS candidates than Fire candidates. Id. ¶ 46. After the written exam and assessment are complete, all Fire and EMS candidates are ranked relative to each other on a single promotional registry based on the scores they received. Id. ¶¶ 33, 49–52. Before being ranked, however, Fire candidates' assessment scores are converted via a mathematical process, whereas EMS candidates' scores are not. Id. ¶ 49. O'Byrne alleges that this conversion process "artificially inflat[es]" the Fire candidates' scores to appear 39.15% higher than an equivalent EMS candidate's score. Id. ¶¶ 49, 51. Candidates are then selected for a promotion in the order of their ranking on the promotional registry. Id. ¶ 34.

## II. Employment Outcomes

[2] The complaint does not explain exactly what the assessment entails. It does state that the Fire assessment has fourteen questions, three of which are oral, and that the EMS assessment has seven questions, one of which is oral. Am. Compl. ¶ 46–47.

Only nine out of 105 Captains employed by FEMS are female, all of whom started as paramedics and were promoted before the 2020 MOA was implemented. Id. ¶¶ 26–27. There are no female Fire Captains. See id. Since the 2020 MOA took effect, O'Byrne has been the only EMS candidate to be promoted to Sergeant and then Lieutenant. Id. ¶ 2, 37. Of the candidates promoted to Captain since then, none have been women. Id. ¶¶ 27, 58, 76–78.

During the 2024 promotional cycle, O'Byrne, then a Lieutenant, sought promotion to Captain. Id. ¶¶ 59, 62. She was the only female EMS candidate to pass the written exam for promotion to Captain that cycle. Id. ¶ 2. She then took the EMS Captain's assessment, on which she received the second highest raw score across both EMS and firefighter candidates. Id. ¶¶ 68, 75. After scores were converted, however, O'Byrne was ranked last—fifty sixth out of fifty-six candidates—on the promotional registry. Id. ¶ 68. The fifty-five candidates ranked above her were all Fire Lieutenants, fifty-two of whom were men. Id. ¶¶ 38, 69. Since being placed on the 2024 registry, O'Byrne has not been selected for a promotion to Captain. Id. ¶ 77. Twenty-nine candidates have been promoted, all of whom have been men. Id. ¶¶ 76, 78. One female Fire Lieutenant was offered a Captain position but declined it. Id. ¶ 78 n.6. The registry expires sometime in 2026 when the next promotion cycle begins. Id. ¶ 79.

In addition to not being promoted to Captain, O'Byrne was also recently removed from her operational EMS Lieutenant position. Id. ¶ 84.[3] In late 2022, Local 36 grieved O'Byrne's promotion to EMS Lieutenant, arguing that only firefighters could be operational Lieutenants

[3] There are two categories of EMS Lieutenant—administrative Lieutenant and operational Lieutenant, only the latter of which may carry out various clinical and safety duties. Id. ¶¶ 37 & n.3, 81. In 2022, O'Byrne was promoted to an operational Lieutenant position. Id. ¶¶ 20, 84.

under the 2020 MOA. Id. ¶¶ 80–81.[4] In 2024, the arbitrator agreed with Local 36, and the D.C. Public Employee Relations Board and Superior Court then each rejected FEMS's appeals of the arbitration decision. Id. ¶ 83. As a result, O'Byrne was reassigned from her role as EMS Lieutenant to the role of Emergency Medical Liaison Officer. Id. ¶ 84.[5]

In December 2025, O'Byrne filed suit before this Court, bringing federal and state law claims of disparate impact and disparate treatment. See Compl. ¶¶ 70–117 [ECF No. 1]; Am. Compl. ¶¶ 87–134. Before the Court now are Local 36's and the District's motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). See Local 36 Mot. to Dismiss [ECF No. 19]; D.C. Mot. to Dismiss [ECF No. 20]. The motions are fully briefed and ripe for consideration.

## Discussion

"To survive a motion to dismiss [under Rule 12(b)(6) for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Courts "must accept as true" all factual allegations but not

[4] Local 36 argued that paramedics could only be promoted to administrative Lieutenant positions, not operational Lieutenant positions. Id. ¶ 81. O'Byrne characterizes the administrative Lieutenant position as "a hollow role set aside for those grandfathered into Local 36 when they were unable to pass the EMS Captain exam, lacking the operational functions of an EMS provider." Pl.'s Opp'n to Local 36's Mot. to Dismiss (Pl.'s Opp'n to Local 36) [ECF No. 21] at 8; see Am. Compl. ¶ 37 & n.3.

[5] The parties' briefing does not make clear whether O'Byrne is currently eligible for a promotion to Captain given her reassignment to the role as Emergency Medical Liaison Officer. O'Byrne and Local 36 both explain that the arbitrator's decision disallows single-role paramedics from becoming operational Lieutenants, but that they can become administrative Lieutenants. Local 36 Mot. to Dismiss at 15; Pl.'s Opp'n to Local 36 at 4; see Arbitrator's Award [ECF No. 19-5] at 2. But the parties do not explain whether the Emergency Medical Liaison Officer falls under the umbrella of "administrative Lieutenant" nor whether administrative Lieutenants can be promoted to Captain. This issue will have to be clarified at later stages of litigation. For now, the Court assumes that single-role paramedics are still eligible to become Captain. See 2020 MOA ¶ 6 ("When a vacancy arises to be filled off of an existing promotional list, the highest scoring member shall be selected, regardless of whether the individual tested as a civilian single-role provider or as a dual-hazard sworn member.").

legal conclusions. Id. And courts analyze disparate impact and disparate treatment claims brought under the District of Columbia Human Rights Act in the same way as claims under the federal antidiscrimination laws. Davis v. District of Columbia, 925 F.3d 1240, 1248 (D.C. Cir. 2019).

For the following reasons, the Court concludes that O'Byrne has met her burden at the pleading stage for both her disparate impact and disparate treatment claims, and accordingly, the Court will deny the District of Columbia's and Local 36's motions to dismiss.

## I. Disparate Impact

O'Byrne alleges that both the Department and Local 36 have violated the disparate-impact prohibitions under Title VII and the DCHRA. 42 U.S.C. § 2000e-2(k); D.C. Code § 2-1402.68. A disparate impact claim challenges "practices, procedures, or tests that may be neutral on their face … but that disproportionately harm members of a protected class." Davis, 925 F.3d at 1248 (citation modified). To succeed at the motion to dismiss stage, a plaintiff need not establish each element of a prima facie case of discrimination, Feloni v. Mayorkas, Civ A. No. 22-2094, 2023 WL 3180313, at *7 (D.D.C. May 1, 2023), but instead "must plausibly allege that a disparity exists and identify a practice or policy that plausibly caused the disparity," Shanks v. Int'l Union of Bricklayers & Allied Craftworkers, 134 F.4th 585, 592 (D.C. Cir. 2025). See Young v. Covington & Burling LLP, 736 F. Supp. 2d 151, 161 (D.D.C. 2010) ("A plaintiff is not required to prove that the employment practice caused a disparate impact at this stage of the proceedings, but only needs to make allegations that state a 'cognizable claim.'").

The Court determines that O'Byrne can meet this modest burden. First, O'Byrne identifies the specific employment practices that she challenges, including the provision of unscored firefighting questions on the written exam, the use of different assessments with different point values across candidate type, and the mathematical conversion of assessment scores before

candidates are ranked on the promotional registry. Am. Compl. ¶¶ 42–44, 45–47, 49–52. Each of the practices she challenges allegedly were implemented pursuant to the 2020 MOA and subsequent discussions between FEMS and Local 36. Id. ¶ 32, 37. Second, O'Byrne plausibly alleges that a disparity in promotions exists between female and male employees at FEMS: 13% of employees at FEMS are women, but all of the employees promoted to Captain since 2020 have been men. Id. ¶¶ 23, 26–27. Finally, the Court finds it plausible that the practices O'Byrne identifies inflate the scores of Fire candidates and make it infeasible for EMS candidates to be promoted to Captain, thereby impeding the main avenue for women to become Captain within FEMS. See id. ¶¶ 37–38, 58.

Defendants challenge O'Byrne's disparate impact claim on multiple grounds, all of which the Court finds unconvincing at the motion to dismiss stage. The Court addresses each of defendants' arguments below.

*A. Identifying a Particular Employment Practice or Policy*

To succeed on a disparate impact claim, a plaintiff must first "identify[] the specific employment practices … being challenged." Smith v. City of Jackson, 544 U.S. 228, 241 (2005). This requirement ensures that employers are not held responsible for "unidentified events or a myriad of innocent causes [that] cumulate over time to result in … gendered statistical imbalances in a workforce." Davis, 925 F.3d at 1249 (citation modified). A "bundle of criteria behind a specified employment event," including "standardized rules or tests," may constitute a "specific employment practice." Id. Nothing in Title VII precludes a plaintiff from bringing a disparate impact claim that challenges multiple employment practices. See 42 U.S.C. § 2000e-2(k)(1)(B)(i); Davis, 925 F.3d at 1249 (discussing the requirement to identify the specific "employment practice or practices" being challenged (emphasis added)).

The Court is satisfied that O'Byrne has identified the employment practices she challenges with sufficient specificity to survive a motion to dismiss. O'Byrne's complaint does not merely allege that there are unidentified events causing a "bottom-line" gender imbalance in the Captain position. Davis, 925 F.3d at 1252. Instead, she points to a specific hiring process, implemented in 2020, that she alleges makes it "virtually impossible" for female EMS employees to obtain promotions to Captain. Am. Compl. ¶¶ 28–32. And she goes even further by identifying the specific aspects of that process that she challenges, including the fact that Fire and EMS written exams and assessments have a different number of scored questions and that Fire candidates' raw scores are mathematically converted, and thereby inflated, before candidates are ranked on the promotional registry. Id. ¶¶ 33–52.

D.C. argues that O'Byrne's claim fails because the complaint relies on the cumulative effects of these practices rather than "isolat[ing] the disparate impact of each challenged practice." D.C. Mot. to Dismiss at 7. True, to ultimately succeed on a disparate impact claim, a plaintiff must demonstrate that "each particular challenged employment practice causes a disparate impact," unless the plaintiff can demonstrate that multiple "elements of a respondent's decisionmaking process are not capable of separation for analysis," in which case "the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). D.C. contends that each element of the promotional process O'Byrne identifies is a discrete practice that is capable of separation for analysis, so O'Byrne's complaint was required to allege that each one individually caused a disparate impact. D.C. Mot. to Dismiss at 6–7.

The Court determines that O'Byrne's failure to assert that each element of the hiring process individually caused a disparate impact is not fatal at the motion to dismiss stage. A Title VII plaintiff "need not prove a prima facie case of disparate impact" to survive a motion to dismiss.

Feloni, 2023 WL 3180313, at *7. And "[n]othing in Title VII suggests that … at the pleading stage, without the benefit of discovery," a plaintiff must demonstrate that aspects of an employer's "decisionmaking process are not capable of separation for analysis." Tolton v. Jones Day, Civ. A. No. 19-945, 2020 WL 2542129, at *23 (D.D.C. May 19, 2020). "[W]hat matters at this stage of the proceeding is whether Plaintiffs have 'put the defendant on notice of what they intend to prove at trial' and whether those allegations support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (citation modified) (first quoting Powell v. Ridge, 189 F.3d 387 (3d Cir. 1999); then quoting Iqbal, 556 U.S. at 678).

In her complaint, O'Byrne puts defendants on notice of what she intends to prove at trial by identifying the specific elements of the promotion process that she challenges. See Am. Compl. ¶¶ 33–52. Moreover, "[d]rawing all reasonable inference[s] in [her] favor at this stage of the proceeding," the Court finds it plausible that O'Byrne will be able to demonstrate at future stages of litigation that certain of the elements of the promotion process that she challenges are incapable of separation for analysis. Tolton, 2020 WL 2542129, at *23.[6] O'Byrne's allegations may therefore be analyzed cumulatively for the purpose of a motion to dismiss. See id. (holding that plaintiff challenging law firm's compensation system, including "'No Whining' policy," "pay secrecy policy," "subjective evaluation system," and "hyper-centralization of final pay, promotion, and related policy decision-making," could survive motion to dismiss); cf. Pride v. U.S. Dep't of Agric., Civ. A. No. 23-2292, 2024 WL 3924579, at *8 (D.D.C. Aug. 23, 2024) (holding that claim

[6] See Davis v. D.C., 496 F. Supp. 3d 303, 315 (D.D.C. 2020) (holding at the summary judgment stage, on remand from the D.C. Circuit, that the "entire process" an agency used to reduce its workforce—including the agency's decision to "abolish [certain] job categories" and "other individualized, discretionary and subjective choices made by individual managers"—was incapable of separation for analysis (citation modified)).

of disparate impact caused by "all stages of the direct loan process" could survive motion to dismiss).

And even assuming that each element of the hiring process that O'Byrne identifies is a discrete "employment practice" that is capable of separation for analysis, O'Byrne can still proceed to the next stage of litigation. To survive the motions to dismiss, O'Byrne only needs to state a cognizable claim for any one of the employment practices she challenges. Tolton, 2020 WL 2542129, at *23. And, as discussed in more depth below, it is plausible that at least the mathematical conversion of Fire candidates' scores, alone, caused a disparity in promotions between female and male employees at FEMS.[7]

*B. Alleging that the identified practices caused a disparity*

Once a plaintiff has identified specific employment practices, she must plausibly allege that a disparity exists in the workplace and that the practices she identified plausibly caused that disparity. Shanks, 134 F.4th at 592. Plaintiffs generally make this showing through statistical evidence, but "at the initial pleading stage, basic allegations of statistical comparisons can suffice." Id. at 594 (citation modified). "A plaintiff's complaint need not prove in detail the methodological soundness of [the] statistical assessment" nor "supplement its statistical analysis with corroborating evidence." Id. (citation modified). And judges in this District have even found that

[7] D.C. also argues that the promotion process as applied to the Sergeant, Lieutenant, and Captain positions must be analyzed separately. D.C. Reply [ECF No. 25] at 2. And because O'Byrne was successfully promoted to Sergeant and Lieutenant, D.C. contends that she does not have standing to challenge those promotional processes (only the Captain promotion process). Id. at 1–3; D.C. Mot. to Dismiss at 6 n.2. But the facts alleged demonstrate that O'Byrne was stripped of her operational Lieutenant position because of the arbitration brought by Local 36, and therefore she did suffer an adverse employment action as it pertains to that position. See Townsend v. United States, Civ. A. No. 15-1644, 2019 WL 4060318, at *10 (D.D.C. Aug. 27, 2019) (holding that a lateral transfer "may qualify as an adverse action" where, like here, "the reassignment left the plaintiff with significantly diminished responsibilities"). In any event, the complaint alleges that the promotion processes for Sergeant, Lieutenant, and Captain are identical, and O'Byrne argues that this process caused her not to be promoted to Captain. There is no suggestion from the pleadings that O'Byrne challenges any unique aspect of the Sergeant or Lieutenant employment process.

a complete lack of statistical data "is not necessarily fatal" at the motion to dismiss stage, so long as the plaintiff "indicate[s] in the complaint that she will later be able to provide some sort of statistical evidence." Brown v. Mayorkas, Civ. A. No. 20-3107, 2023 WL 3303862, at *11 (D.D.C. May 8, 2023); see Menoken v. McGettigan, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (denying motion to dismiss despite lack of statistical evidence but articulating that "[p]laintiff will now have to … come forward with the necessary statistical evidence"); Jianqing Wu v. Special Couns., No. 14-7159, 2015 WL 10761295, at *2 (D.C. Cir. Dec. 22, 2015) ("Although [defendant] need not present statistical evidence in his complaint, he must be able to present such evidence at some point.").

O'Byrne's complaint includes multiple "basic allegations of statistical comparisons." Shanks, 134 F.4th at 592 (citation modified). First, the complaint provides statistics regarding the gender demographics at FEMS: in total, 13% of FEMS employees are female. Am. Compl. ¶ 23. Looking to specific provider type, 57% of single-role EMS providers are female, whereas 90% of dual-role firefighters are male. Id. ¶¶ 24–25. The complaint also provides statistics regarding the gender breakdown of promotions to Captain in FEMS. There are nine female Captains in FEMS, making up 8.6% of all Captains. Id. ¶ 26. But all the female Captains were promoted before the 2020 MOA was implemented and all started as single-role EMS providers. Id. ¶ 27. Since the 2020 MOA was implemented, no women have been promoted to Captain, while in the 2024 promotional cycle alone, 29 men have been promoted to Captain. Id. ¶¶ 27, 58, 76–78. All promotions to Captain since 2020 have therefore been men. Id.

O'Byrne also provides basic data about how the employment practices that she identifies caused this disparity in promotions. First, she points to the fact that on the written exam, an incorrect answer carries a 1.205 point penalty for EMS candidates but only a 1 point penalty for

Fire candidates. Id. ¶ 42. As alleged, this difference "is highly significant given that the first ranked candidate and the thirty-sixth ranked candidate are separated by approximately 10 points and the sixth and the thirty-sixth ranked candidates are separated by less than 5 points." Id. ¶ 43. Further, the complaint alleges that the mathematical conversion of Fire candidates' assessment scores inflates the scores to be 39.15 percent higher than an equivalent EMS candidate's score. Id. ¶ 51. O'Byrne alleges that her raw assessment score was the second highest score of all candidates, but due to the mathematical conversion of scores, she was ranked 56th out of 56 candidates on the promotional registry. Id. ¶ 68.

O'Byrne additionally provides anecdotal evidence to help demonstrate causation. For example, the complaint alleges that Local 36 grieved O'Byrne's promotion to an operational Lieutenant position, arguing that single-role paramedics could not serve in this role under the 2020 MOA. Id. ¶¶ 80–81. O'Byrne contends that Local 36's grievance demonstrates that the 2020 MOA's function is to strip single-role EMS providers, and in turn women, from promotion opportunities within FEMS. Pl.'s Opp'n to Local 36's Mot. to Dismiss (Pl.'s Opp'n to Local 36) [ECF No. 21] at 8–9.

In sum, O'Byrne's complaint paints the following causal picture: (1) most single-role EMS providers are women, (2) historically, all the women who have become Captains started as single-role EMS providers, not firefighters, (3) the practices O'Byrne identifies inflate Fire candidates' scores and make it nearly impossible for EMS candidates to obtain promotions, and (4) as a result, women in FEMS are denied the opportunity to become Captain.

Defendants make several specific challenges to O'Byrne's allegations. First, both D.C. and Local 36 argue that the statistics are insufficient to demonstrate a disparity in promotions exists because O'Byrne "does not allege that any other single-role EMS providers, male or female,

applied for the 2024 promotional process, nor has she alleged how many other single-role EMS providers (if any) applied in prior years." Local 36 Mot. to Dismiss at 22. Defendants contend that it is "impossible to derive meaningful conclusions from the outcome obtained by one applicant." Id. at 23–24; see also D.C. Mot. to Dismiss at 7–9 (arguing that a sample size of one is insufficient to demonstrate a significant disparate impact).

Defendants are correct that a plaintiff alleging a disparate impact usually may not survive a motion to dismiss by alleging a disparate impact on only herself. See McKnight-Nero v. Walmart, Inc., Civ. A. No. 20-1541, 2021 WL 663315, at *6 (D.D.C. Feb. 19, 2021) (dismissing plaintiff's complaint on ground that she did not "identify or otherwise hint at a single person other than herself" who was impacted by the policy she challenged); City of Joliet v. New W., L.P., 825 F.3d 827, 830 (7th Cir. 2016) ("Disparate-impact analysis looks at the effects of policies, not one-off decisions."). However, in the context of an employment promotion process, there is no question that the process impacts the protected class as a whole: any woman applying for a promotion would have to undergo the promotion process that O'Byrne challenges.

Nor does a small number of applicants in the protected class necessarily undermine O'Byrne's claim, since "otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." Dothard v. Rawlinson, 433 U.S. 321, 330 (1977); cf. De Medina v. Reinhardt, 686 F.2d 997, 1009 n.8 (D.C. Cir. 1982) ("Actual discrimination or the appearance of discrimination may discourage qualified women from applying.") Courts have therefore found that in the application context, "[a] statistical showing of disparate impact need not … be premised on an analysis of the characteristics of actual applicants." Mandala, 975 F.3d at 210 n.4 (emphasis added). Instead, a plaintiff may allege a disparate impact claim by showcasing a disparity between the percentage of

people in the protected class who are promoted and the percentage of people in the protected class who belong to the organization as a whole. See Howard v. Gutierrez, 571 F. Supp. 2d 145, 161 (D.D.C. 2008) (denying motion to dismiss where complaint presented statistics indicating that "percentage of African Americans ... declines" at each level of promotion); McReynolds v. Sodexho Marriott Servs., Inc., 349 F. Supp. 2d 1, 8–9 (D.D.C. 2004) (comparing the "proportion of the protected group in each of the job classifications" and "the proportion of the protected group with the minimum necessary qualifications … in the employer's labor force as a whole"); cf. Davis v. Califano, 613 F.2d 957, 964–65 (D.C. Cir. 1979) (holding that plaintiff could make out a prima facie case of discrimination by indicating a disparity between the percentage of females in upper grade positions at NIH and the overall percentage of female employees at NIH). Here, O'Byrne makes such a showing: 13% of employees at FEMS are female, but no women have been promoted to the role of Captain since 2020.[8]

Local 36 also argues that the specific promotion practices that O'Byrne identifies do not plausibly cause any disparity. Local 36 Mot. to Dismiss at 26–28. The Court disagrees. The fact that a Fire candidate's score is allegedly inflated by 39.15 percent on its own tends to suggest that EMS candidates, and in turn women, are disfavored by the promotion process.[9] This causal link is bolstered by the timeline of promotions in FEMS: women were promoted to Captain before the 2020 MOA took effect, but none have been promoted since it took effect.

---

[8] The MOA provides that female EMS providers are eligible and qualified for promotion to Captain. See 2020 MOA ¶ 6 ("When a vacancy arises to be filled off of an existing promotional list, the highest scoring member shall be selected, regardless of whether the individual tested as a civilian single-role provider or as a dual-hazard sworn member.").

[9] The Court is less convinced on the current record by the allegations that the number of scored points on the written exam and the assessment contribute to the disparate impact on women. At future stages of litigation, O'Byrne will have to come forward with more statistical data about how these stages cause a disparate impact on women, or otherwise demonstrate that the different stages of the promotion process are incapable of separation and must be analyzed as one.

The Court is also not convinced by Local 36's contention that "[i]t is implausible to infer that the challenged practices have caused women to be disparately excluded from promotions" because O'Byrne "herself obtained promotions" to Sergeant and Lieutenant "when the very same practices were employed." Local 36 Mot. to Dismiss at 28. For one thing, O'Byrne has since been stripped of her operational Lieutenant position, demonstrating that the 2020 MOA has undermined EMS candidates' ability to obtain even lower-level promotions.[10] Moreover, "at the pleading stage[,] courts do not generally scrutinize causation claims." Tolton, 2020 WL 2542129, at *26; see Menoken, 273 F. Supp. 3d at 199 (denying motion to dismiss where plaintiff's allegations were "barely sufficient to create an inference of causation"). All that is required is for O'Byrne "to state a claim for relief that is plausible on its face." Tolton, 2020 WL 2542129, at *27 (citing Twombly, 550 U.S. at 570). At future stages of litigation, O'Byrne will have to provide data that demonstrates why the employment practices she challenges cause a disparate impact on female employees' promotion to Captain despite her successful promotion to Sergeant. But for now, the Court is satisfied that the statistics provided are sufficient for O'Byrne to plausibly allege that a disparity exists and that the disparity was caused by the practices she identifies.[11]

[10] Local 36 cited the 2020 MOA as the reason that EMS candidates were not eligible for operational Lieutenant positions. See Am. Compl. ¶ 81.

[11] The Court also rejects the remainder of defendants' arguments. For example, Local 36 contends that O'Byrne's statistical evidence of a disparity is insufficient because there are female dual-role Firefighter candidates, and these candidates benefit from FEMS's promotion process. Local 36 Mot. to Dismiss at 16–18. But Title VII only requires a plaintiff to demonstrate that a facially neutral policy "fall[s] more harshly on one group than another," Figueroa v. Pompeo, 923 F.3d 1078, 1085 (D.C. Cir. 2019), not that every member of that group is disfavored. See Connecticut v. Teal, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."). Jianqing Wu v. Special Counsel, the case that Local 36 cites for this proposition, is inapposite. In that case, the court dismissed plaintiff's complaint which, among other things, alleged that an employment policy unlawfully favored uneducated native Chinese speakers and disfavored educated native Chinese speakers. 54 F. Supp. 3d at 56. The Court emphasized that plaintiff's complaint alleged a disparity based on education status, a characteristic not protected by Title VII, and made no showing that there was a disparity based on national origin. Id. Here, in contrast, O'Byrne provides data that plausibly suggests that women as a class are disproportionately disadvantaged by the FEMS promotion procedures.

*C. Defendants' Fault*

Local 36 argues that even if a plausible disparity was alleged, the union was not responsible for the employment decisions that allegedly caused the disparity. Local 36 Mot. to Dismiss at 18–21, 28. To make this argument, Local 36 turns to the text of its collective bargaining agreement (CBA) with FEMS and the 2020 MOA. Id. at 19–21. On a motion to dismiss for failure to state a claim, courts "may consider … any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). Although O'Byrne did not append a copy of the MOA or CBA to her complaint, both documents were incorporated by reference. See Am. Compl ¶ 28. The Court can therefore consider the documents at this stage of proceedings.

Looking to the text of these documents, several elements of the hiring process that O'Byrne challenges are addressed. For example, the 2020 MOA explicitly eliminates the EMS Battalion position and requires EMS candidates to instead go through the ranks of Sergeant and Lieutenant before being promoted to Captain. See 2020 MOA [ECF No. 19-3] ¶ 2. Additionally, the 2020 MOA states that the promotional exam shall be the same for all test-takers, "except that questions

---

D.C. also argues that the disparate impact claim fails because Fire candidates and EMS candidates have "different skill sets" and are therefore not "similarly situated" employees. D.C. Mot. to Dismiss at 10. However, the two groups are similarly situated in the relevant respect: they are both qualified and eligible to become Captain, ranked on the same promotional registry, and ultimately compete against each other for the same Captain positions. See 2020 MOA ¶ 6 ("When a vacancy arises to be filled off of an existing promotional list, the highest scoring member shall be selected, regardless of whether the individual tested as a civilian single-role provider or as a dual-hazard sworn member."). This is distinct from Seth v. D.C, on which D.C. relies, in which the D.C. Circuit held that individuals with mental illnesses and individuals with intellectual disabilities were not similarly situated in a disparate impact case regarding access to community-based services because the law varied drastically on when each group could be civilly committed. 813 F. App'x 611, 615 (D.C. Cir. 2020).

Finally, D.C. attempts to argue that the complaint fails because the 2020 MOA is not facially neutral. D.C. Mot. to Dismiss at 9–10. In the first instance, the MOA is facially neutral: it does not explicitly discriminate based on gender. In any event, "[t]he point of doctrinal references to 'facially neutral employment practices' is not to make facial neutrality an element of proof in disparate-impact cases, but merely to make clear that—even though they may lack the overtly or intentionally discriminatory character of practices constituting disparate treatment—facially neutral practices, too, may be challenged under Title VII." Davis, 925 F.3d at 1247.

related to fire suppression operations … shall not be scored for single-role civilian test-takers." Id. ¶ 5. However, other elements of the challenged promotion process are not explicitly covered by the MOA. For example, the 2020 MOA does not mention anything about converting fire candidates' scores before candidates are placed on the promotional registry. See id. at 1–2. Local 36 states that it therefore has nothing to do with this practice and in turn had nothing to do with O'Byrne's non-promotion. Local 36 Mot. to Dismiss at 18–21. To support this argument, Local 36 cites to the CBA, which states that, "[i]n the notices of examination, the Fire and EMS Chief shall set forth the relative weight that shall be given to the written examination score and the assessment center score in compiling the relative standing lists for each qualifying examination." Collective Bargaining Agreement [ECF No. 19-2] at 4 (emphasis added).[12]

O'Byrne, in contrast, alleges that Local 36 was responsible for every element of the hiring process that she challenges. See Am. Compl. ¶¶ 28–32. She points to D.C. law, which states that employers have the right to promote employees, subject to any agreement reached with the labor unions representing their employees. D.C. Code § 1-617.08(a)(2); Pl.'s Opp'n to Local 36 at 6–7. According to O'Byrne, the text of the MOA was not the only agreement that FEMS and Local 36 reached regarding the promotion process. Rather, the complaint alleges that Local 36 and FEMS had subsequent discussions pursuant to Paragraph 8 of the MOA,[13] and that "[t]hrough the MOA and [these] subsequent discussions … Defendants Local 36 and DC FEMS reconfigured the promotion system." Am. Compl. ¶ 32.

[12] "Notices of Examination" refers to notifications given for each promotional exam. See Collective Bargaining Agreement at 3–4.

[13] Paragraph 8 of the 2020 MOA states that Local 36 and FEMS should "meet at a mutually agreeable date … to determine if the agreed upon process requires modification." 2020 MOA ¶ 8.

O'Byrne's allegations are sufficient, albeit barely, to plausibly allege fault on the part of Local 36 for her non-promotion. The fact that the 2020 MOA itself does not discuss the mathematical conversion of scores does not preclude the possibility that an agreement on this issue was reached in subsequent conversations between FEMS and Local 36 contemplated in the MOA. Similarly, the CBA's requirement that the Fire and EMS Chief notify candidates of the relative weight to be given to the assessment and written exam does not necessarily mean that Local 36 was not involved in determining these weights. Although Local 36 disputes that it shaped the promotional process outside of what was written in the MOA, such a factual dispute is beyond the bounds of what this Court considers at the pleading stage. See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555) (holding that courts "must accept as true" all factual allegations in the complaint). Taking O'Byrne's allegations as true, it is plausible that Local 36 was in part responsible for each of the promotion practices that O'Byrne challenges.

## II. Disparate Treatment

O'Byrne also alleges that Local 36 engaged in disparate treatment in violation of Title VII and the DCHRA. See 42 U.S.C. § 2000e-2(a); D.C. Code § 2-1402.68. To state a disparate treatment claim, a plaintiff must allege (1) membership in a protected class and (2) an adverse employment action (3) giving rise to an inference of discrimination.[14] Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007). As to the third element, "[t]he pleadings must allow a causal inference that the protected trait was a motivating factor for the adverse action." Brown v. Trinity Wash. Univ., Civ. A. No 22-1612, 2023 WL 2571729, at *8 (D.D.C. Mar. 20, 2023) (citation

[14] A plaintiff need not "plead the elements of a prima facie case," but must still allege sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014); see Blackmon-Malloy v. U.S. Capitol Police Bd., Civ. A. No. 01-2221, 2024 WL 4298853, at *13 (D.D.C. Sept. 26, 2024) ("[Plaintiff] must only allege enough facts that allow the Court to consider his allegations of intentional racial discrimination plausible.").

modified); see Segar v. Smith, 738 F.2d 1249, 1265 (D.C. Cir. 1984) ("[A] disparate treatment claim … seeks to prove that an employer intentionally treats some people less favorably than others because of their race, color, religion, sex, or national origin." (citation modified)).

"There is no question that failure to promote is an 'adverse action' for purposes of the prima facie case." Stella v. Mineta, 284 F.3d 135, 146 (D.C. Cir. 2002). Because O'Byrne is a woman who was denied promotion to the rank of Captain, the only disputed issue is whether her "complaint alleges sufficient facts to support a reasonable inference that [her nonpromotion] can be attributed to her" gender. Johnson v. Georgetown Univ., 827 F. Supp. 3d 133, 158 (D.D.C. 2026).[15]

O'Byrne's complaint does not allege any direct proof that she was denied a promotion because of her gender. The FEMS promotion process is facially neutral, as was Local 36's grievance of her operational Lieutenant position. O'Byrne does not otherwise identify any specific statements or conduct by Local 36 that demonstrate bias or animus against women. But direct evidence of intentional discrimination is not a prerequisite to a disparate treatment claim. Rather, a complaint may give rise to a plausible inference of discrimination through circumstantial evidence, Shanks, 134 F.4th at 596, including statistical evidence of a workplace disparity between a protected class and the majority group, Davis v. District of Columbia, 949 F. Supp. 2d 1, 8 (D.D.C. 2013); see Segar, 738 F.2d at 1266 (same).[16]

The difference between a disparate treatment claim that relies on statistical evidence and a disparate impact claim is what caused the disparity at issue. Generally, disparate impact claims

[15] The Court has already determined that it is plausible that Local 36 is responsible for O'Byrne's non-promotion. The Court therefore rejects Local 36's argument that it is not liable for disparate treatment because it was not responsible for failing to promote O'Byrne. See Local 36 Mot. to Dismiss at 18–21.

[16] Statistical proof of discriminatory intent is more common in class actions alleging a "pattern or practice" of discrimination, but can also be sufficient in "single-plaintiff cases." Davis, 949 F. Supp. 2d at 8; see Davis v. Califano, 613 F.2d at 962–63.

allege that "facially neutral employment practice[s]" caused a workplace disparity, whereas disparate treatment claims allege that intentional discrimination did so. Davis, 949 F. Supp. 2d at 10–11. But a plaintiff who identifies a facially neutral employment practice as the cause of a workplace disparity can still raise an inference of intentional discrimination by demonstrating that the employer intended or knew that the neutral practice would have discriminatory effect. Id. at 11 (holding that disparate treatment claim could survive motion to dismiss where plaintiff alleged that employer requiring family social workers to hold bachelor's degrees knew or should have known that this requirement would have disparate impact on African American candidates).

The Court concludes that O'Byrne has alleged just enough circumstantial evidence, including statistical evidence, to "support a reasonable inference" that her nonpromotion "can be attributed to her" gender. Johnson, 827 F. Supp. 3d at 158. The complaint alleges that, despite women making up 13% of FEMS, no women have been promoted to Captain since the 2020 MOA. In contrast, at least 29 men in the 2024 promotion cycle alone have been promoted to Captain. O'Byrne identifies facially neutral employment practices, including the conversion of Fire candidates' assessment scores, that she alleges cause this disparity by preventing EMS candidates, and thereby women, from being promoted to Captain. And she also argues that Local 36 intended to "target[] the only source of women being promoted to Captain" and ultimately "halt the promotion of female candidates" when it crafted these promotional procedures. See Pl.'s Opp'n to Local 36 at 8–9 (citation modified).

The Court ultimately concludes that this claim is plausible. O'Byrne provides statistics demonstrating that the only women to be promoted to Captain before the 2020 MOA was implemented began as single-role paramedics. It is plausible, and even likely, that Local 36 was aware when it implemented the 2020 MOA that the exclusive path by which women achieved

promotions to Captain in FEMS was via the EMS promotion process. And O'Byrne presents circumstantial evidence suggesting it is plausible that Local 36 intended for the 2020 MOA to block this pathway. For example, O'Byrne points to Local 36's grievance of her promotion to EMS Lieutenant, in which Local 36 argued (over the objection of FEMS) that under the 2020 MOA, EMS candidates are not permitted to obtain the operational Lieutenant position and instead can only reach the "hollow role" of administrative Lieutenant. Id. at 8. O'Byrne further alleges that Local 36's conduct—initiating a grievance of O'Byrne's promotion and arguing that EMS candidates can never obtain the operational Lieutenant position—suggests that Local 36 intended for EMS candidates, and therefore women, to be denied promotions more broadly. The Court ultimately finds that these allegations are sufficient to survive the motion to dismiss and merit development through discovery.

## CONCLUSION

For the foregoing reasons, the Court will deny defendants' motions to dismiss as to both the disparate treatment and disparate impact claims. A separate order will accompany this opinion.

/s/
JOHN D. BATES
United States District Judge

Date: November 10, 2026